SALLIE A. BAKER, Respondent, v. JOHN R. LYELL, Administrator of the Estate of SARAH E. COCH-RAN, deceased, Appellant.

St. Louis Court of Appeals. Opinion Filed June 13, 1922.

1. **EXECUTORS AND ADMINISTRATORS: Claims Against Estates: Claim for Services by Member of Family: Presumptions.** The law implies no promise to pay for services rendered by one member of a family to another, but, on the contrary, the presumption, prima facie, is that such services are rendered gratuitously, casting upon the party claiming compensation therefor the burden of rebutting such presumption; and it devolves upon the claimant to prove that there was an agreement or understanding to pay for such services.

2. ————: ————: ————: **Promise to Pay May be Implied from Facts or Circumstances.** The promise to pay for services rendered by one member of a family to another may be proven either by direct testimony or by adducing evidence from which it may be inferred there was a mutual understanding and intention to that effect.

3. ————: ————: ————: **Agreement to Pay for Services: Evidence: Question for the Jury.** In an action by a member of a family against the estate of a deceased member to recover for services rendered, evidence *held* sufficient to take to the jury the issue as to whether or not there was mutual understanding or agreement that the services in question were not voluntary but that compensation was to be made therefor. :

4. ————: ————: ————: **Mere Expectation of Gift or Gratuity by Will or Otherwise Not Sufficient: Relation of Debtor and Creditor Must be Established.** In an action by a member of a family against the estate of a deceased member to recover for services rendered, the evidence should be such as to tend to establish the relation of debtor and creditor between the parties, and the assumption by the deceased of a legal obligation capable of being enforced, and the mere expectation by the claimant of a gift or gratuity by will or otherwise, is not sufficient to support a recovery.

5. ————: ————: ————: **Services Rendered: Agreement to Pay: Entitled to Payment Although Expected in Different Manner.** Even though claimant, a member of the family of deceased rendering

services, expected compensation in a certain manner, if there was an agreement or understanding that compensation was to be made for the services, claimant would be entitled to it although she did not get it in the form so expected.

6. ——: ——: ——: ——: **Evidence: Sufficiency.** In an action by a member of a family against, the estate of a deceased member to recover for services rendered, *held* there was sufficient evidence from which the jury could properly find that plaintiff rendered services.

7. **INSTRUCTIONS: Improper to Refer the Jury to Account Filed.** In an action against an estate to recover for services rendered, an instruction which referred the jury to the account filed by plaintiff, the account constituting the pleadings in the case, was improper.

8. ——: ——: **Error Harmless in View of Other Instructions: Remittitur.** In an action against the estate of a deceased person to recover for services rendered, an instruction referring the jury to the account filed, which account constituted the pleadings, was not prejudicial error where the reference to the account was not to ascertain the issues in the case but rather to identify the services about which an issue was made, in view of other instructions given, except with respect to one item which a remittitur may cure.

9. ——: **Claims Against Estates: Family Relationship: Refused Instruction Not Prejudicial Error in View of Theory of Instructions Given.** In an action against an estate to recover for services rendered deceased, where the instructions given for both plaintiff and defendant proceeded upon the theory that the family relation existed between the plaintiff and the deceased during the period covered by the account, and that it was therefore necessary for plaintiff to establish that there was an agreement or understanding between them that compensation was to be made plaintiff for the services rendered by her during such period, it was not error to refuse an instruction offered by defendant that there was no evidence in the case that the family relationship existing at a certain time was ever interrupted or changed.

10. **WITNESSES: Physician of Deceased: Evidence: Not Incompetent as Confidential Communication.** In an action against an estate to recover for services rendered deceased, testimony of deceased's physician that he had a conversation with deceased on the day prior to her death and that she said that she wanted to compensate plaintiff for her services was not incompetent as being a disclosure of confidential communications made by a patient to her physician.

Appeal from the Circuit Court of Shelby County.—
*Hon. V. L. Drain,* Judge.

REVERSED AND REMANDED (*conditionally*).

*James P. Boyd* and *Harry J. Libby* for appellant.

*John D. Dale* for respondent.

ALLEN, P. J.—This proceeding was begun in the
Probate Court of Shelby County, on September 13, 1919,
by the filing by plaintiff, Sallie A. Baker, of a demand
against the estate of Sarah E. Cochran, deceased, as fol-
lows:

"To Labor and Services from July,
    1914, to September, 1918, 51
    months at $20.00 per month.... $1020.00
"To Nursing during illness, 77 days     165.00
                                     ——————
            "Total............ $1185.00"

The trial of the cause in the probate court resulted
in a judgment for plaintiff in the sum of $700. Upon
defendant's appeal to the circuit court and a trial there
de novo, before the court and a jury, there was a verdict
and judgment for plaintiff for the full amount of the
demand, to-wit, $1185, and the defendant estate has ap-
pealed to this court.

Mrs. Sarah E. Cochran died intestate in Shelby
County on May 6, 1919, being about seventy years of
age. The plaintiff, Sallie A. Baker, is a niece of Mrs.
Cochran; plaintiff's mother, Nannie Baker, now de-
ceased, having been a sister of Mrs. Cochran. The evi-
dence shows that approximately forty years prior to the
trial of the cause below there was a separation between
plaintiff's parents, James Baker and Nannie Baker, at
which time plaintiff was a baby but a few weeks old.
Upon separation from her husband plaintiff's mother
went to the home of her sister, Mrs. Cochran, taking
plaintiff with her. Thereafter the three lived together
in the home of Mrs. Cochran, as members of one house-

hold, until plaintiff was about eighteen years of age when she married one Smith. Plaintiff and her husband lived together for but a period of about seven months when she separated from her husband and returned to Mrs. Cochran's home. The time of plaintiff's return to Mrs. Cochran's home, after separating from her husband, is not definitely fixed by the evidence but it appears to have been about the year 1896. From that time plaintiff and her mother continued to live at Mrs. Cochran's home, the three women living as one family, until sometime in 1913 when plaintiff, on the advice of her physician, went to Montana, with her mother, on account of her health, remaining there until about July 4, 1914. It appears that the tilled land upon Mrs. Cochran's farm was rented to tenants; that Mrs. Cochran owned some live stock, and that prior to plaintiff's first trip to Montana she and her mother had some stock upon the place. Neither of the three women had good health. Mrs. Cochran had bronchial asthma for many years. Plaintiff's mother had a tubercular condition diagnosed by her physician as tabes mesenterica. And plaintiff became afflicted with tuberculosis.

Letters in evidence from Mrs. Cochran to plaintiff, to which we shall later refer, indicate that plaintiff returned from Montana at the urgent request of Mrs. Cochran, who was then advanced in years and in declining health. Plaintiff remained with her aunt until September, 1918, when, it seems, she was compelled to return to Montana on account of the precarious condition of her own health. Testimony of witnesses for plaintiff tends to show that during the period here involved, viz., from July, 1914, to September, 1918, plaintiff rendered services in Mrs. Cochran's home and upon her farm, consisting of cooking, washing, sewing, putting up fruit and other housework, feeding and watering stock, milking, marketing produce, nursing Mrs. Cochran and dressing a wart on the latter's hand, said to have been of a cancerous nature.

Prior to the trial below plaintiff's mother had died. Plaintiff was, of course, not a competent witness in her own behalf. Consequently plaintiff's case rests upon the testimony of witnesses who saw plaintiff performing services of the character mentioned, from time to time, during the period involved, testimony as to certain statements or declarations made by Mrs. Cochran and the letters in evidence, written by Mrs. Cochran to plaintiff while the latter was in Montana. In one of these letters, dated at Shelybville, Mo., March 30, 1914, Mrs. Cochran wrote to plaintiff:

"Sallie I will write again I want you to write and tell me when you are coming and what you have to say about me and my home and what I have wrote to you & your mother or have you gone to stay and not giving any ideah to me about what I have offered I would like to know right away I do not know what I will do I have tried to get different ones failed so far to stay with me I cannot sleep nor rest nor eat only a little I am in great trouble did you know yesterday was my birthday 68 years old Please write and tell me what you and your mother are going to do I do not know what I will do if you do not I cannot sleep all alone. It seems my stomach and neck and head will kill me taking 3 kinds of medicine all the time I do not know what I am to do if you do not give me any hope I do not know how I am to stand it. . . . Please come while I am on earth if will not be long Oh do come I think if you knew my condition you would not hesitate I am not as well every letter I write you can depend I am telling the truth no scare it is true facts about myself Please do come while I live do not weight till I am not there to see Oh if I could make you believe ask your Papa if you do not believe me do not weight till two late to all O do come Your Aunt Sallie

"Please do come as soon as you can Sallie I will pay you and your mothers way to come home do come now."

In another letter to plaintiff, Mrs. Cochran said: "If I get down I do not want a trained nurse I want you and

your mother to be with me until the last. I cannot live alone.''

The record shows no other portion of the correspondence between the parties. However, as said, the evidence does show that plaintiff, with her mother, returned from Montana to Mrs. Cochran's home early in July, 1914, and remained there until September, 1918.

Dr. Carson, a physician who treated Mrs. Cochran and plaintiff and her mother as well, testified that he had a conversation with Mrs. Cochran on the day prior to her death, and that Mrs. Cochran said that she wanted to compensate plaintiff for her services; that she wanted to reward plaintiff for her kindness, and compensate her for her services during the number of years she had been there. The witness stated that Mrs. Cochran asked him if she was competent to make a will, and that he told her that she was not physically able to do so. On cross-examination the witness said that in reference to compensating plaintiff Mrs. Cochran referred to plaintiff's companionship and services.

Being recalled, the witness, referring to plaintiff's trip to Montana in 1913, said: ''She was not able to do what was to be done there and I advised her to change.'' When asked what he saw plaintiff doing around the house, he said: ''Well just the ordinary household duties around the house, the work, and I think she took care of the cows. He stated that plaintiff took care of Mrs. Cochran whenever the latter needed attention; that Mrs. Cochran was not confined to her bed all of the time. He was asked whether he had seen plaintiff giving any personal attention to Mrs. Cochran, and he said: ''Yes, sir, at different times.'' When asked to tell what this was, he said: ''Well the ordinary attention that a sick person would require as a companion or nurse.'' When questioned in regard to the reasonable value of the services which he saw plaintiff performing, ''in taking care of the home and Mrs. Cochran and the work about the home,'' he said: ''I suppose $40 or $50 a month would be reasonable.''

Testifying further, on cross-examination, this witness said that during the period from 1914 to 1918 he was sometimes called to administer to plaintiff when he was not called to see Mrs. Cochran. His further testimony in this connection is as follows: "Q. Who was taking care of her (plaintiff)? A. Her mother and neighbors. Q. Her Aunt Sarah was not doing anything for her? A. She was there; I suppose she did; she didn't seem to do the most of the work; she was there and helping. Q. Mrs. Cochran was helping to nurse Mrs. Baker, the plaintiff in this case? A. Yes, sir. Q. How many times were you called to see Sallie Baker when you were not called to see Mrs. Cochran? A. I don't know. Q. But each time you were called to see Mrs. Baker, the plaintiff in the case, when you were not called to see Mrs. Cochran, Mrs. Cochran was helping take care of her? A. Yes, sir. Q. Mrs. Cochran was nursing Mrs. Baker at times, and Mrs. Baker was nursing Mrs. Cochran at times? A. Yes, sir. Q. They took it just as a family would? A. Yes, sir."

G. W. Collier, a neighbor, testified that he had a conversation with Mrs. Cochran before plaintiff returned from Montana; that Mrs. Cochran "said she would like awful well for them (plaintiff and her mother) to come back; she was lonesome there by herself and it didn't seem like any of the rest of them cared anything for her;" that "she thought Sallie ought to have everything she had, and she believed that was the way she would fix it."

Mrs. Emma Fugate testified that she came to live with Mrs. Cochran in November, 1918, under a contract to take care of her. The witness had not known Mrs. Cochran prior to that time. She stayed with Mrs. Cochran until the latter's death on May 6, 1919. She testified that Mrs. Cochran "often would cry and say she never had given Sallie (plaintiff) anything for staying there, and never had treated her right, and she wished she had done better by her."

George B. Duncan, a neighbor, testified that from 1914 to 1918, inclusive, he visited at Mrs. Cochran's

home perhaps three times a year; that upon one of these visits, in 1914 when plaintiff was in Montana, Mrs. Cochran, referring to plaintiff and the latter's mother, said: "I keep writing that I want them to come—if they will just come I expect to deed Sallie this place because I can't live alone and none of the rest of them will come and live with me." Referring again to this conversation, the witness said: "She (Mrs. Cochran) was wishing Sallie would come back and said she couldn't get her to come back; she had made her propositions to come back but she wouldn't accept any of them." This witness testified that he had seen plaintiff feeding and milking the cows. As to the housework, he said: "It seems as though Sallie was doing it when I was there." And he stated that he had seen plaintiff washing the dishes and sewing for her aunt, Mrs. Cochran.

A. L. Mahaffey, who lived on a farm adjoining that of Mrs. Cochran during the period covered by plaintiff's claim, testified that he was at Mrs. Cochran's home a few times during such period, though not frequently; that he had seen plaintiff doing work about the home and doing "work on the farm, driving stock to the river and cutting the ice and letting them get water, and such work as that." The witness said: "From my place I could see that. My place was joining their place and their meadow was north of my place, and between my place and their place, and I could see her there and see her throwing hay off the stack and feeding the cattle. Mrs. Cochran had some land west of my place too and she (plaintiff) would drive the cattle down to water them while the pond was frozen up." On cross-examination the witness said that he had seen Mrs. Cochran and plaintiff together at times attending to the stock; that plaintiff, her mother and Mrs. Cochran lived together in the home as a family, and that he saw them all doing work taking care of the stock at different times. He further said that he thought that plaintiff and her mother disposed of their stock on the place before going to Montana.

Mrs. Mary E. Duncan, a cousin of plaintiff, testified that during the period covered by plaintiff's claim she

visited at the Cochran home about once every two months; that "it seemed that Sallie and her mother did the housework;" that Sallie did "cooking, washing dishes, sewing, putting up fruit and the general housework." And the witness said that she had seen plaintiff doing the feeding, and that plaintiff usually marketed the produce on the place; that Mrs. Cochran had a cancerous wart upon her hand and could not do the work out of doors; that when plaintiff and her mother were in Montana Mrs. Cochran told her that she was living there alone, and could not live that way; that she always wanted Sallie to have the home place and wanted her to come back and live with her. Testifying further as to these conversations, she said: "Well, she (Mrs. Cochran) said Sallie had done more for her than anybody else would do for her and she couldn't live with none of the rest of them, and she would have to have her come back and live with her." She further testified that Mrs. Cochran, on the day prior to her death, requested the witness to ask the doctor if she could make a deed or will, saying that she wanted to deed Sallie the home place to compensate her for her services—"for her services she had rendered there in the last four years."

On cross-examination this witness testified that plaintiff, when she went to Montana in 1913, sold the stock which she had on the Cochran farm, leaving none of her property there except some furniture. She was questioned at length in regard to her testimony on direct examination to the effect that Mrs. Cochran had said that she wanted to deed or will plaintiff the home place to compensate her for her services; reference being made to the testimony given by the witness in the probate court in that connection. The gist of the testimony thus elicited is that Mrs. Cochran did not in terms say to the witness that she wanted to deed or will the home place to plaintiff to compensate the latter for her services, but did say that she wanted to deed or will plaintiff the place, saying, in the same connection, that she never had paid plaintiff for what plaintiff had done for

her; and that Mrs. Cochran spoke of this matter "a number of times."

The testimony of A. R. Spencer, who conducted a store in the community, merely shows that plaintiff regularly marketed Mrs. Cochran's produce, raised upon her farm during the period involved.

The foregoing is, in substance, all of the evidence adduced by plaintiff which could have any material bearing upon the issues in the case. At the close of plaintiff's case defendant offered a peremptory instruction in the nature of a demurrer to the evidence, and this being refused, proffered no testimony.

It is contended by appellant's learned counsel with much force and earnestness that the trial court erred in refusing to peremptorily direct a verdict for defendant. It is true that the evidence shows that for many years prior to 1913, and after plaintiff's return from Montana as well, plaintiff, her mother and Mrs. Cochran lived together at the Cochran home as members of one family. The law implies no promise to pay for services rendered by one member of a family to another, but on the contrary the presumption, prima-facie, is that such services are rendered gratuitously, casting upon the party claiming compensation therefor the burden of rebutting such presumption; and in order to recover therefor it devolves upon the claimant to prove that there was an agreement or understanding to pay for such services, either by direct testimony or by adducing evidence from which it may be inferred that there was a mutual understanding and intention to that effect. This rule has been so often stated and applied by our courts as to make it unnecessary to do more than refer thereto. [See Fitzpatrick v. Dooley, 112 Mo. App. 165, 86 S. W. 719; Cole v. Fitzgerald, 132 Mo. App. 17, 111 S. W. 678; Stone v. Troll, 134 Mo. App. 308, 114 S. W. 82; Brand v. Ray, 156 Mo. App. 622, 137 S. W. 623; Hartley v. Estate of Hartley, 173 Mo. App. 18, 155 S. W. 1099; Crowley v. Dagley, 174 Mo. App. 561, 161 S. W. 366; Kingston v. Estate of Roberts, 175 Mo. App. 69, 157 S. W. 1042;

Hyde v. Honiter, 175 Mo. App. 583, 158 S. W. 83; Wood v. Lewis, 183 Mo. App. 583, 167 S. W. 666; Brown v. Holman, 238 S. W. 1065.]

However, as said in Cowell v. Roberts, 79 Mo. 218, l. c. 221, quoted approvingly in the recent case of Brown v. Holman, supra, "the promise to pay may be implied from any facts or circumstances which in their nature justify the inference of an actual contract of hire or an actual understanding between the parties to that effect;" or, as said by ELDER, J., in Brown v. Holman, supra, "it is enough for the claimant to adduce evidence from which the jury might find that he and the deceased understood that the services rendered were not voluntary but were to be remunerated."

In the instant case we think that the facts and circumstances in evidence are sufficient to take to the jury the issue as to whether or not there was a mutual understanding or agreement that the services in question were not voluntary but that compensation was to be made therefor. It is true, as contended by appellant, that the evidence in such cases should be such as to tend to establish the relation of debtor and creditor between the parties, and the assumption by the deceased of a legal obligation capable of being enforced; and that the mere expectation by the claimant of a gift or gratuity, by will or otherwise, is not sufficient to support a recovery. The evidence here, we think, is such as to warrant the jury in inferring that there was a promise or agreement on the part of the deceased to compensate plaintiff for the services in question, and an intention on the part of the claimant to charge therefor.

While prior to 1913 the parties lived at the Cochran home as members of one family, this relationship was disturbed when plaintiff was compelled to go to Montana on account of her health. Just what intention plaintiff had with regard to returning therefrom does not directly appear, but the jury could well infer that she intended to remain in Montana so long as the condition of her health reasonably required it, and permanently if need

be. In the letter written by Mrs. Cochran to plaintiff, from which we have quoted at length above, Mrs. Cochran not only pleads with plaintiff to return to her, but makes reference to an offer previously made by her to plaintiff to induce the latter to return to her home and live with her and take care of her in her declining years. And, as shown above, there is testimony in the record as to declarations of Mrs. Cochran to the effect that she had made offers to plaintiff, and intended to give plaintiff her property if plaintiff would return to her home and care for her. We think the jury could legitimately infer that plaintiff, at the risk of her own health, returned to Mrs. Cochran's home, pursuant to such offer or offers, for the purpose of staying with Mrs. Cochran and caring for her, as she did from about the first of July, 1914, to September, 1918. These letters, together with all of the surrounding facts and circumstances shown in evidence, amply suffice, we think, to support the inference that there was an agreement or understanding between the parties to the effect that plaintiff was to be compensated for her services if she returned from Montana and lived with and took care of the deceased.

It is true that the evidence suggests that the deceased intended to compensate plaintiff by giving to plaintiff her farm and perhaps her other property as well; and it may be that plaintiff expected compensation in that manner. But, as said in Christianson v. Mc-Dermott's Estate, 123 Mo. App. 448, l. c. 451 (100 S. W. 63), "We are at a loss to know why, if a remuneration was expected and promised for the services, plaintiff would not be entitled to it although she did not get it in the form so expected." The pertinent question is whether the parties intended the services to be gratuitous or whether there was an agreement or understanding that compensation was to be made therefor. [See Biggerstaff v. Riley, Admr., 192 Mo. App. 92, 179 S. W. 744.]

As to the first item of the account, which is quite general, being merely for "labor and services," there is

210 M. A.—16

sufficient evidence, we think, from which the jury may properly find that plaintiff rendered services, during the period involved, consisting of various household duties, caring for stock, marketing produce, and the like, as well as giving personal care and attention to the deceased in illness. It is true that there is some testimony to the effect that at times, during such period, plaintiff was sick and needed attention, and that upon such occasions Mrs. Cochran helped to nurse her. But the fact that plaintiff, who, it seems, had returned to care for her aunt at the risk of her own health, was sometimes sick, and upon occasions was administered to by her mother and aunt, does not suffice to defeat a recovery herein, in view of all of the other evidence in the case tending to support plaintiff's claim.

As to the second item of the account, there is no proof in the record of continuous nursing of Mrs. Cochran by plaintiff for a period of seventy-seven days, or eleven weeks. As to the nursing, the testimony, as set out above, merely shows that from time to time plaintiff, in connection with her other duties, nursed Mrs. Cochran when necessary, and that she dressed Mrs. Cochran's hand. This testimony, along with the other testimony in the case, tends to support the first item of the account, but does not support a recovery as for any definite period of nursing. This is a matter, however, that may be cured by a remittitur.

Aside from mere formal instructions, the court gave but one instruction at plaintiff's request, which is as follows:

"The court instructs the jury that if they find from the greater weight of the evidence in this case, that the plaintiff rendered valuable services to the deceased Sallie Cochran, *as set out in plaintiff's account filed in this case,* and that there was an agreement or understanding between the Sallie Cochran, the deceased, and the plaintiff, that plaintiff should be paid for such services, then the estate of Sallie Cochran is liable for the reasonable value of such services, not to exceed the amount sued

for, to be determined by the jury from all of the evidence and circumstances in the case, unless the jury should further find from the evidence that Sallie Cochran, the deceased, paid plaintiff in her lifetime.'' (Italics ours.)

At defendant's request the court gave the following instructions:

"The court instructs the jury that the burden of proof in this case is upon the plaintiff and it devolves upon the plaintiff to prove by the greater weight of the evidence that Sarah E. Cochran in her lifetime, and before the services sued for herein were rendered, agreed to pay plaintiff for her services in laboring for and nursing said Sarah E. Cochran, and that said Sallie A. Baker expected and intended to charge said Sarah E. Cochran for said services, and that under and pursuant to said arrangement, the said Sallie A. Baker did render services to said Sarah E. Cochran in laboring for her between July, 1914, and September, 1918, or in nursing said Sarah E. Cochran, during her illness, and unless plaintiff has proven these facts, your verdict must be for the defendant. And in this connection, you are instructed that declarations made by Sarah E. Cochran of an intention to deed or will plaintiff land or property, upon the death of her, the said Sarah E. Cochran, are not sufficient in law to prove an intention on the part of Sarah E. Cochran to pay for such services, even though you may believe from the evidence that said Sarah E. Cochran intended to so deed or will plaintiff said farm or property at her death, in compensation for such services.''

"The Jury are instructed that in order to entitle the plaintiff to recover in this case, it is not enough that she prove that she rendered some services to Sarah E. Cochran between July, 1914, and September, 1918, in laboring for and nursing said Sarah E. Cochran. Such facts, even if proven, and even though the services were of great value, do not entitle plaintiff to recover in this action. Before plaintiff can recover in this action it devolves upon her to prove by the greater weight of the evidence, that she not only rendered said services to

said Sarah E. Cochran, but she must also prove that said Sarah E. Cochran expected and intended to pay plaintiff for such services in her lifetime, and that plaintiff expected and intended to charge said Sarah E. Cochran for the same during her lifetime. You have no right to presume that said arrangement was entered into, but you must find it to be true from the evidence in the case. And in this connection you are further instructed that an intention on the part of said Sarah E. Cochran to deed or will said Sallie A. Baker a farm or property, upon the death of said Sarah E. Cochran is not sufficient to establish such arrangement, even though you may believe said Sarah E. Cochran announced said purpose and intent to many persons and even though you may believe from the evidence that such willing or deeding of property was to be done as compensation for the services rendered by said Sallie A. Baker to said Sarah E. Cochran.''

''The court instructs the jury that if you believe from the evidence in the cause that from July, 1914, to September, 1918, the Claimant, her mother and Sallie Cochran lived together as one family and that the claimant and Sallie Cochran each understood that they were living together as one family, then and in that event the claimant cannot recover in this cause unless you further find from the greater weight of the evidence in the cause that the said Sallie Cochran before said services were rendered agreed to pay said Sallie Baker for such services and that the said Sallie Baker at the time of rendering said services understood that she was to be paid therefor and at the time of rendering the same expected to charge said Sallie Cochran for such services.''

Appellant complains of the said instruction given at plaintiff's request, on the ground (first), that ''it referred the jury to the pleadings in the case to determine for what services they could compensate plaintiff,'' and '(second), that there was no evidence to support the hypothesis that there was an agreement or undertaking between the deceased and plaintiff that plaintiff was to be compensated for her services.

The second objection to the instruction has been disposed of by what we have said above. As to the first, viz., that the instruction improperly referred the jury to the account filed by plaintiff, there can be no doubt that the instruction is subject to criticism in this regard. [See: Small v. Ice & Fuel Co., 179 Mo. App. 456, l. c. 465, 162 S. W. 709; Rouse v. Fire & Marine Ins. Co., 203 Mo. App. 603, 219 S. W. 688; Bank v. Dowler, 163 Mo. App. 65, l. c. 68, 145 S. W. 843; Williams v. Tucker, 224 S. W. 21.] It has been held reversible error to give an instruction referring the jury to the pleadings to ascertain the issues in the case. [Bank v. Dowler, supra; Williams v. Tucker, supra.]

However, reference in an instruction to the pleadings is not always harmful error, as will be seen by reference to the following cases: Hartpence v. Rogers, 143 Mo. 623, 45 S. W. 650; Ekstan v. Herrington, 204 S. W. 409; Dwyer v. Transit Co., 108 Mo. App. 152, l. c. 162, 83 S. W. 303; Butcher v. Bell, 198 S. W. 1123, 1124. In the instant case there are no pleadings, strictly speaking, and the reference to the account was not to ascertain the issues in the case but rather to identify the services about which an issue was made. [See Ekstan v. Herrington, supra; Dwyer v. Transit Co., supra.] Since the first item of the account is merely for "labor and services," reference to the account in the instruction could not have had the effect of allowing a recovery for services of a kind and character not shown by the evidence, except for the item for nursing, as to which no recovery may be allowed because of lack of proof to support it. It is true that the instruction does not, except by reference to the account, confine the recovery to services rendered during the period from July, 1914, to September, 1918. But in adducing the evidence before the jury it was made clear time and again that the services in question were those rendered by plaintiff during the period mentioned, following plaintiff's return from Montana. And it will be seen that in each of defendant's instructions, which we have set out in full above, reference is made to the

period covered by plaintiff's claim. And defendant's first instruction, supra, definitely requires the jury to find that plaintiff rendered services during the period mentioned, as a predicate of liability.

Under the circumstances we do not think that the reference in plaintiff's instruction to the account could have confused or misled the jury to defendant's prejudice, unless, as said, it be with respect to the item for nursing which a remittitur may cure. So far as concerns a recovery upon the first item of the account, the fault to be found with this instruction cannot well be regarded as error materially affecting the merits of the action or the substantial rights of the appellant.

Complaint is made of the refusal by the court below of the following instruction offered by defendant, viz.:

"The jury are instructed that there is no evidence in this case that the family relationship existing between plaintiff and Sarah E. Cochran from the time said Sallie A. Baker was a few months old, was ever interrupted or changed until said Sallie A. Baker went to Montana the second time, to-wit, in September 1918."

We think that there was no error in refusing the instruction under the facts in evidence. Certainly the refusal thereof could not constitute error prejudicial to defendant warranting a reversal of the judgment, for the reason that the instructions given for both plaintiff and defendant, as appears above, proceed upon the theory that the family relation existed between plaintiff and the deceased during the period covered by the account, and that it was therefore necessary for plaintiff to establish that there was an agreement or understanding between them that compensation was to be made plaintiff for the services rendered by her during such period.

Error is assigned to the action of the trial court in permitting Dr. Carson to testify to declarations of the deceased, over appellant's objections, on the ground that such declarations were confidential and privileged communications by a patient to her physician. But it is

clear that this assignment of error is without merit. The witness was not allowed to testify to any information acquired by him from Mrs. Carson in his professional capacity as her physician, for the purpose of treating her or in connection with such treatment; objections being sustained to all questions of this character. The testimony of the witness which was admitted was not incompetent as being a disclosure of confidential communications made by a patient to her physician. [See Hamilton v. Crowe, 175 Mo. 634, 75 S. W. 389.]

Beyond allowing a recovery for the second item of the account, we perceive no prejudicial error in the case. If, therefore, plaintiff will remit the amount of the second item of the account, to-wit, $165, within ten days from the date of the delivery of this opinion, the judgment will be reversed and the cause remanded with directions to the circuit court to enter a new judgment for plaintiff in the sum of $1020, with interest from the date of the entry of the original judgment; otherwise the judgment will be reversed and the cause remanded for a new trial. It is so ordered.

*Becker* and *Daues, JJ.,* concur.